## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**DOLHIA IGNJATOVIC,**

   **Plaintiff**

   **v.**

**CAREGIVERS AMERICA, LLC**

   **Defendant**

:
:
:
:
:
:
:

**CIVIL ACTION NO. 3:24-cv-75**

**(JUDGE MANNION)**

FILED
SCRANTON

AUG 0 9 2024

PER _____
DEPUTY CLERK

## MEMORANDUM

Plaintiff Dolhia Ignjatovic claims that her former employer, Defendant Caregivers American LLC, discriminated against her on the basis of her gender and retaliated against her for making complaints about discrimination. (Doc. 10). Plaintiff also claims that Defendant violated the Pennsylvania Whistleblower Law (the "PWL") and discharged her in violation of Pennsylvania public policy. (Id.). Defendant moves for partial dismissal of Plaintiff's Amended Complaint (the "Complaint"). (Doc. 12).

## I.    BACKGROUND

### A. Factual Background

Because this is a motion to dismiss, the court must "accept all factual allegations as true." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).

Plaintiff began working for Defendant, a Pennsylvania company providing health and home care services, in June 2019. (Doc. 10 ¶¶3, 17, 23). She was promoted to Care Coordinator and began working in Defendant's Pottsville office in April 2023. (Id. ¶¶24–27). A transgender woman, Plaintiff faced "severe and pervasive discrimination because of her sex" upon starting in Pottsville. (Id. ¶¶27–28).

Plaintiff's Pottsville coworkers made frequent "harassing comments about [her] transgender status." (Id. ¶29). Another Care Coordinator, Darlene Smith ("Smith") repeatedly referred to her using either male pronouns or as a "thing" and an "it." (Id. ¶30). Smith also misgendered her in conversation with an interviewee and called her a "freak," and subsequently hired the interviewee despite Plaintiff's objections. (Id. ¶31). Finally, Plaintiff encountered "inappropriate, uncomfortable, and probing questions about her genitalia" from other coworkers. (Id. ¶32). Such questions included: "how do you pee?," "how does it feel during sex?," and similar inquiries. (Id.) Plaintiff

- 2 -

made complaints to management, but they took no action, and one manager told her to "get over it." (Id. ¶35).

In July 2023, Plaintiff reported to different management personnel that Defendant was failing to perform background checks and tuberculosis screenings on new hires before allowing them to work and was failing to maintain employee files and charts properly, in violation of state regulations. (Id. ¶¶37–39). At about the same time, Plaintiff also reported to the same management personnel that certain employees were working too many consecutive hours, which she believed violated labor laws, posed safety risks to clients, and amounted to misuse of funds by payment of unnecessary overtime. (Id. ¶40).

Overtime payment came in part from funding Defendant received from the state through Medicaid. (Id. ¶41). Medicaid is "funded and managed by and through the Commonwealth of Pennsylvania." (Id. ¶18). Indeed, Defendant is "funded largely by" Medicaid reimbursements it receives from the Commonwealth for the services it provides to clients on Medicaid. (Id. ¶20).

In response to Plaintiff's reports, the Branch Manager instructed Plaintiff's coworkers to bring the office into compliance with regulations. (Id.

¶42). Her coworkers then ostracized and berated her for making the reports. (Id. ¶¶43–44).

On July 13, 2023, Plaintiff told a human resources ("HR") representative about her regulatory compliance concerns, as well as "the workplace discrimination and harassment she was enduring because of her transgender status." (Id. ¶47). Four days later, that HR representative visited Plaintiff's worksite "ostensibly to investigate Plaintiff's concerns," but informed her that Defendant was suspending her without pay. (Id. ¶49). At around the same time, Plaintiff contacted the Pennsylvania Department of Health (the "Department") about the office's regulatory non-compliance. (Id. ¶50). The Department investigated the office on July 21, 2023 and confirmed Plaintiff's reports. (Id. ¶51). On the same day, Defendant terminated Plaintiff because of an event that occurred months prior and resulted in no discipline at the time. (Id. ¶¶52–53). Plaintiff's role was then transferred to a non-transgender employee. (Id. ¶ 56).

**B. Procedural History**

Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission on January 10, 2024. (Id. ¶7). She received

a Notice of Rights to Sue from the EEOC on January 16, 2024, (id. ¶9), and filed this action the same day. (Doc. 1).

Plaintiff filed an Amended Complaint on April 1, 2024. (Doc. 10). The Complaint brings the following claims against Defendant: (I) Title VII – Discrimination, Retaliation, Hostile Work Environment, and Wrongful Termination; (II) Pennsylvania Whistleblower Law ("PWL") – Discrimination, Retaliation, and Wrongful Termination; and (III) Pennsylvania Common Law – Wrongful Discharge in Violation of Public Policy. (Id.). Plaintiff seeks compensatory and punitive damages.

Defendant filed a partial motion to dismiss the Complaint on April 15, 2024. (Doc. 12). Specifically, Defendant moves to dismiss all of Counts II and III, as well as the sex discrimination and retaliation portions of Count I. (Id.)

## II.   LEGAL STANDARD

In response to a complaint, a party may move for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, a complaint must make more than "conclusory or 'bare-bones' allegations," and "'threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice.'" *Fowler v.*

*UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, the complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

When considering the complaint, the court must apply a "two-part analysis." *Id.* "First," the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. "Second," the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim to relief." *Id.* at 211. When determining the sufficiency of the facts alleged, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

## III.   DISCUSSION

### A. Title VII

Title VII of the Civil Rights Act of 1964 makes it unlawful for employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). It also prohibits discriminating against employees for engaging in certain protected activities. *Id.* §2000e-3(a).

### i. Sex Discrimination

Plaintiff claims that Defendant fired her for being transgender and that she was thus discriminated against because of her sex. Plaintiff's gender identity is protected by Title VII. *See Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020). That is because, although the statute does not refer to "gender identity," discrimination because of one's transgender status is discrimination because of one's sex. *Id.* at 660–62.

Absent direct evidence of discrimination, a successful Title VII claim requires a plaintiff to establish a prima facie case of discrimination under the *McDonnell-Douglass* framework.[1] *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). To do so, the plaintiff must plead that: (1) she "is a member of a protected class"; (2) she "was qualified for the position s[]he sought to ... retain"; (3) she "suffered an adverse employment action"; and (4) "the action occurred under circumstances that could give rise to an

---

[1] *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Defendant argues that Plaintiff has failed to satisfy the fourth element. (Doc. 12 at 10–11). An inference of intentional discrimination may arise when a similarly situated employer outside of the plaintiff's protected class is treated more favorably by the defendant despite engaging in the same conduct as the plaintiff. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). This element can also be satisfied by "circumstantial evidence that otherwise shows a causal nexus between … membership in a protected class and adverse employment action." *Greene v. Virgin Islands Water & Power Auth.*, 557 Fed. App'x 189, 195 (non-precedential) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 n.7 (3d Cir. 2003)).

Plaintiff has failed to satisfy the fourth element because she has not alleged that she was treated less favorably than similarly situated employees or that her gender identity shared a causal relationship with her suspension and termination.

As Defendant points out, Plaintiff's allegation "that cisgender coworkers were not subject to workplace harassment or discriminatory comments because of their sex," (Doc. 10 ¶ 33), is insufficient, for she "fails to assert that they engaged in the same conduct she did." (Doc. 13 at 10–

11). Nor does she allege that these coworkers were similarly situated. *See Wilcher v. Postmaster Gen.*, 441 Fed. App'x 879, 882 (3d Cir. 2011) (non-precedential) ("[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects."). Plaintiff has thus failed to satisfy the fourth element through comparison to similarly situated employees.

Plaintiff has also failed to allege a "causal nexus" between her gender identity and her suspension and termination. *Greene*, 557 Fed. App'x at 195. While Defendant's Branch Manager's (the "Manager") alleged response to Plaintiff's complaints of harassment—"you just need to learn to work together and get over it"—raises eyebrows, (Doc. 1 ¶35), mere inaction on the Manager's part does not suggest that Defendant intentionally discriminated against Plaintiff because of her gender identity. Plus, the Complaint does not indicate that the Manager took part in Plaintiff's suspension and termination. (Id. ¶35).

Plaintiff also contends that the temporal proximity between the HR representative learning of her transgender status and her suspension and termination creates an inference of intentional discrimination. (Doc. 14 at 10–11). But the court cannot infer that the representative discriminated against

Plaintiff because of her transgender status simply because she *knew* of that status, even if that knowledge was recently acquired.[2]

Nor do the various comments made by Plaintiff's coworkers suffice, for "stray remarks" by non-decisionmakers, "standing alone, are inadequate to support an inference of discrimination." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). Finally, the Complaint's allegation that Plaintiff's termination was based on "clearly pretextual" reasons, (Doc. 10 ¶52), is a conclusory statement that does not give rise to an inference of discriminatory intent. *See Iqbal*, 556 U.S. at 678.

Ultimately, the facts pled do not show a causal relationship between Plaintiff's gender identity and her suspension and termination. So Plaintiff has not pled that these actions occurred under circumstances that could give rise to an inference of intentional discrimination. Accordingly, Plaintiff has failed to state a claim for Title VII discrimination.

---

[2] Plaintiff relies here on precedent considering temporal proximity between Title VII protected activities and adverse employment actions as suggestive of a causal link in retaliation claims. (Doc. 14 at 11 (first citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007); then citing *Lichtenstein v. Univ. of Pittsburgh Med. Cr.*, 691 F.3d 294, 307 (3d Cir. 2012); and then citing *Blakney*, 559 Fed. App'x at 186)). But those cases do not support a similar analysis based on mere awareness of a plaintiff's status.

### ii.  Retaliation

A prima facie case of retaliation under Title VII requires a plaintiff to allege that: "(1) [s]he was engaged in protected activity; (2) [s]he was discharged subsequent to or contemporaneously with such activity; and (3) there is a causal link between the protected activity and the discharge." *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

A causal connection can be established in two ways: "(1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Summy-Long v. Pennsylvania State Univ.*, 226 F. Supp. 3d 371, 417 (M.D. Pa. 2016) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 269 (3d Cir. 2007)). As to temporal proximity, "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive" by the employer. *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997)). Regarding a "pattern of antagonism," a "stray remark made by a non-decisionmaker" could be relevant to the question of retaliation "as evidence of the atmosphere in which" the adverse employment action "was carried out." *Woodson*, 109 F.3d at 922. This is because "evidence of condoned harassment can support an inference … that the

- 11 -

employer, having failed to respond to the harassment, also engaged in retaliatory conduct against the plaintiff." *Id.*

Plaintiff has pled the necessary causal connection between her initial complaint to management about "severe and pervasive discrimination because of her sex" and her eventual suspension and termination. (Doc. 1 ¶27). A reasonable, favorable reading of Plaintiff's factual allegations suggests that the length of time between Plaintiff's initial complaint and Defendant's adverse employment action could have been "unusually suggestive." *Lauren*, 480 F.3d at 269. Further, the Complaint's allegations suggest that Plaintiff inhabited a hostile working atmosphere that, coupled with the Manager's inaction, could have contributed to a "pattern of antagonism" by Defendant. *Id.*

Plaintiff has alleged that she was suspended without pay two business days after reporting "workplace discrimination" to Defendant's HR Representative. (Id. ¶¶47–48). A period of this length has been found to be unusually suggestive. *See Blakney v. City of Philadelphia,* 559 Fed. App'x 183, 186 (3d Cir. 2014) (non-precedential) (collecting cases) ("We have found that a temporal proximity of two days is unusually suggestive of causation … but have found that a temporal proximity greater than ten days requires supplementary evidence of retaliatory motive"). In the Third Circuit,

courts "measure temporal proximity from the date on which the litigant first files a complaint." *Id.* (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)). Here, Plaintiff does not specify when she first complained of sex discrimination. Plaintiff only states that she made "multiple complaints" between her appointment as Care Coordinator in April 2023 and her suspension on July 17. (Doc. 1. ¶¶26, 49). Although Plaintiff's pleading is unclear about when her first complaint occurred, construing the facts alleged "in the light most favorable to the plaintiff," a "reasonable reading" suggests Plaintiff's first complaint could have been made within ten days of July 17. *Phillips*, 515 F.3d at 233; *Krouse*, 126 F.3d at 503.

Even if it was not, Plaintiff has alleged a pattern of antagonism that, combined with this temporal proximity, warrants an inference of retaliatory motive. The comments by Plaintiff's coworkers, together with the Branch Manager's inaction, evince an "atmosphere of condoned … harassment" supporting an inference of retaliatory conduct. *Woodson*, 109 F.3d at 922. The court concludes that these circumstances are sufficient to plausibly suggest a causal link between her complaints and her suspension and termination.  Accordingly, Plaintiff has pled a claim for Title VII retaliation.

## B. Pennsylvania Whistleblower Law

The PWL provides that "[n]o employer may discharge, … discriminate or retaliate against an employee … because the employee … makes a good faith report … to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer." 43 Pa. Stat. §1423(a). The PWL defines an "employer" as either a "public body" or an entity "that receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body." *Id.* §1422. A "public body," in turn, includes "the General Assembly and its agencies," municipal bodies, and "[a]ny other body … which is funded in any amount by or through the Commonwealth or political subdivision authority or a member or employee of that body." *Id.*

Plaintiff has not stated a PWL claim because she has not alleged that she reported "wrongdoing … by a public body" or "an instance of waste." *Id.* She has not alleged wrongdoing by a public body because Defendant is not a "public body" under the statute.  And her allegation of waste rests on a conclusory statement that Defendant misused state funds.

A report of "wrongdoing" is not protected under the PWL unless the defendant is a "public body." *Id.*; *see Eaves-Voyle v. Almost Family, Inc.*,

F.Supp.3d 403, 407 (M.D. Pa. 2016) ("Because Plaintiff's amended complaint alleges that Defendant committed an instance of 'wrongdoing' rather than an instance of waste, Defendant must qualify as a 'public body.'"). Plaintiff asserts that Defendant is a public body because it received Commonwealth funding through Medicaid reimbursements. (Doc. 10 ¶71; Doc. 14 at 17).

Whether a recipient of Medicaid funds is a "public body" has given rise to split decisions. Several courts, including the Pennsylvania Superior Court, have ruled in the affirmative. *See, e.g., Denton v. Silver Stream Nursing & Rehabilitation Center*, 739 A.2d 571, 576 (Pa. Super. Ct. 1999); *Romer v. MHM Health Pros.*, Civ. No. 1:20-cv-1275, 2020 WL 6747418, at *3 (M.D. Pa. Nov. 17, 2020); *Heckman v. UPMC Wellsboro*, No. 20-cv-1680, 2021 WL 2826716, at *19 (M.D. Pa. July 7, 2021); *Gloukhova v. CSL Behring LLC*, Civ. No. 22-2223, 2022 WL 16722314 (E.D. Pa. Nov. 4, 2022); *Tucci v. Gilead Sciences, Inc.*, No, 21-cv-1859, 2023 WL 2139931, at *2 (W.D. Pa. 2023). Others have ruled in the negative. *See, e.g., Cohen v. Salick Health Care, Inc.*, 772 F.Supp. 1521 (E.D. Pa. 1991); *Eaves-Voyle*, 198 F.Supp.3d at 403; *Grim v. May Associates* Civ. No. 18-2231, 2019 WL 358520, at *4 (E.D. Pa. Jan. 29, 2019); *Tanay v. Encore Health Care, LLC*, 810 F. Supp. 2d 734, 743-44 (E.D. Pa. 2011).

- 15 -

Since the Supreme Court of Pennsylvania has not ruled on this issue, *see Tucci*, 2023 WL 2139931, at \*2, this court must predict how that court would decide. *See City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993). Decisions made by intermediate state courts are accorded significant, but not dispositive, weight in making that prediction. *See Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 254 (3d Cir. 2010) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."). Here, *Denton* is the only such decision that renders a specific decision on the issue.[3] District courts, on the other hand, have made divergent conclusions even in the wake of *Denton*. Discussion of several of these decisions illustrates the primary divide in reasoning.

The Pennsylvania Superior Court has reasoned that the PWL's plain meaning indicates that a private entity receiving Medicaid reimbursements qualifies as a "public body" because the "public body" definition applies to entities that receive money that is either appropriated *by* the Commonwealth

---

[3] The Superior Court has continued to cite *Denton* favorably. *See Saltzman v. Thomas Jefferson Univ. Hosps., Inc.*, 166 A.3d 465, 475 n.8 (Pa. Super. Ct. 2017).

or simply passed *through* the Commonwealth. *See Denton*, 739 A.2d at 576. In *Denton*, the plaintiff reported wrongdoing by her employer, a nursing facility that received Medicaid reimbursements for its services to patients on Medicaid. *Id.* at 573. After her subsequent termination, she brought a PWL claim against the facility, alleging that it was a "public body" because it received Medicaid funds through the Commonwealth. *Id.* at 573, 576.

The Superior Court in *Denton* declined to examine legislative history, instead finding that the statute's "plain meaning" was "clear": "it was intended to apply" not only to those receiving "legislatively appropriated funds," but "to all agencies that receive public monies under the administration of the Commonwealth." *Id.* at 576. The court reasoned that the "statutory language differentiates between appropriated and 'pass-through' funds," by including the language "by or through," and thus "extends the law to cover both types," allowing private companies receiving Medicaid reimbursements to qualify as public bodies even if they do not receive specifically appropriated state funds. *Id.* at 576. In reaching this conclusion, *Denton* relied on *Riggio v. Burns*, 711 A.2d 497, 500 (Pa. Super. Ct. 1998), which had opined that 43 Pa. Stat. §1422's "funded ... by or through" language was unambiguous. *Denton*, 739 A.2d at 576 (citing *Riggio*, 711 A.2d at 500 ("Where the

language of a statute is unambiguous on its face, we are bound to give effect to that language.")).

In *Grim*, the court came to a different conclusion. The court examined the distinction between an "employer," which "*receives money*" from the Commonwealth, and a "public body," which "is *funded*" by or through the Commonwealth. 2019 WL 358520, at *4. The court reasoned that this distinction between "receiv[ing]" money from the Commonwealth and being "funded" "by or through" the Commonwealth suggests that the definition of "public body" should be read more narrowly as excluding private entities that merely receive Medicaid reimbursements. *Id.* According to *Grim*: "The words 'funded in any amount by or through' are naturally read to denote money that is specifically appropriated by a governmental unit" and which is "not controlled by the whims of patients eligible for Medicaid." 2019 WL 358520, at *4.

The court further opined that reading "public body" as including private entities that merely receive Medicaid funding "would unreasonably expand the scope of the PWL to include any private business that accepts payment from a recipient of government assistance." *Id.* at *4. "In limiting the retaliation provision to the report of wrongdoing by a 'public body,'" *Grim* reasoned, "the legislature could not have intended such a large scope." *Id.*

Thus, the court held that a private entity that receives Medicaid reimbursements, but does not otherwise receive Commonwealth funding or grants, is not a public body. *Id.*; *see also Tanay*, 810 F. Supp. 2d at 743–44 (E.D. Pa. 2011).

*Romer* read "is funded" differently, citing the Cambridge Dictionary definition of "fund": "to provide the money to pay for an event, activity, or organization." 2020 WL 6747418, at *3. The court there reasoned, based on this definition (which it considered "the most basic definition of 'fund'"), that "the plain language of the statute renders any entity a public body if it is paid either directly by the Commonwealth or indirectly by a public entity with money that has passed 'through' the Commonwealth." *Id.*

In short, some district courts have reasoned that both the statute's plain meaning and legislative intent indicate that entities receiving Medicaid reimbursements are not "public bodies," while other district courts and the Superior Court have concluded that, according to the statute's plain meaning, they are.

Consideration of legislative intent is appropriate only if a statute's text is ambiguous. *Harmon v. Unemployment Compensation Bd. of Rev.*, 207 A.3d 292, 304 (Pa. 2019); 1 Pa. Cons. Stat. §1921(c)(7). "A statute is ambiguous or unclear if its language is subject to two or more reasonable

interpretations." *Bethenergy Mines Inc. v. Com., Dept. of Environmental Protection*, 676 A.2d 711, 715 (Pa. 1996). The court finds that, with respect to entities that receive Medicaid reimbursements, §1422's definition of "public body" is ambiguous. That is because "funded … by or through [a] Commonwealth … authority" can "naturally be read to denote money that is specifically appropriated by a governmental unit," *Grim*, 2019 WL 358520, at \*4; *Lomaskin v. Siemens Medical Sols. USA, Inc.*, 820 Fed. App'x 138, 141 (3d Cir. 2020) (non-precedential), and can also reasonably be read as referring to payment that passes indirectly through the Commonwealth, *Romer*, 2020 WL 6747418, at \*3. So consideration of legislative intent is appropriate here.

In ascertaining legislative intent, the court must "assume … that the General Assembly intended the entire statute to be effective," so that no provision is surplusage. *Harmon*, 207 A.3d at 304 (citing 1 Pa. Cons. Stat. §1922). Failing to distinguish between an employer, which "receives money" from the Commonwealth, and a public body, which "is funded" by the Commonwealth, would render the second part of the statutory definition of "employer" ("or any of the following which receives money from a public body ….") surplusage. 43 Pa. Stat. §1422.

- 20 -

If receiving money is interchangeable with being funded, then being "funded in any amount by or through Commonwealth ... authority" would mean functionally the same thing as receiving money from a public body. *Id.* Thus, the definition of "public body" would fully encompass the definition of "employer." And because any "public body" is by definition an "employer," the second part of the "employer" definition would add nothing. The court in *Pugh v. Valmont Industries, Inc.* observed this issue. No. 2:23-cv-1520, 2023 WL 7634758, at *4 (2023). It reasoned that the plaintiff's position that a private entity would be a public body "solely because it receives state funds through contracts with public programs or government agencies"—like considering a private entity a public body solely because it receives Medicaid reimbursements from the Commonwealth—would "render every employer ... a public body" and consequently "run afoul of the cannons of statutory interpretation that Pennsylvania has put in place by creating surplusage." *Id.*

Section 1423 of the PWL also demonstrates an intent that "public body" and "employer" not be coterminous. 43 Pa. Stat. §1423(a). It prohibits retaliation against an employee who "makes a good faith report ... to the employer or appropriate authority [of] an instance of wrongdoing or waste *by a public body* or an instance of waste *by any other employer* as defined in this act." 43 Pa. Stat. §1423(a) (emphasis added). If "public body" fully

- 21 -

encompassed "employer," then the phrase "or an instance of waste by *any other employer* as defined in this act" would be redundant. *Id.* So construing "is funded" more narrowly than "receiv[ing] money," to exclude private companies that merely receive Medicaid reimbursements, avoids reading the PWL as containing surplusage and thus more likely reflects legislative intent.

Acknowledging the Superior Court's decision in *Denton*, the court finds the above-discussed reasoning, which has been employed by another district court following *Denton*, persuasive data that the Pennsylvania Supreme Court would decide otherwise. Accordingly, this court predicts that the Pennsylvania Supreme Court would conclude that private entities receiving Medicaid payments are not thereby "public bodies" under the PWL. *Id.* Therefore, to succeed on Count II, Plaintiff must have sufficiently pled that she reported "waste," an action protected by the PWL. *Id.*

The PWL defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.* In *Grim*, the court concluded that the plaintiff did not plead that her termination was in retaliation for a good faith report of waste because she had not adequately alleged waste. 2019 WL 358520, at *4. It

- 22 -

reasoned that although the plaintiff had allegedly "reported that her supervisor was altering patient charts and that the lab testing equipment was improperly maintained and malfunctioning" she had "not actually pled how either resulted in a substantial abuse or misuse of Medicare and/or Medicaid funds." *Id.*

The court agrees with *Grim* that, in order to state a PWL retaliation claim for her report of waste, Plaintiff must adequately allege waste as defined by the PWL.

Plaintiff alleges that she "reported ... that certain employees were working too many consecutive hours, resulting in the payment of unnecessary overtime and therefore amounting to a misuse of funds" and that she "reasonably believed employees working too many consecutive hours violated the law, posed safety risks to Defendant's consumers and violated labor laws." (Doc. 1 ¶¶40-41, 73). Plaintiff also alleges that these funds come from the Commonwealth: "[T]he wages Defendant paid its employees derived in part from funding Defendant received from the Commonwealth of Pennsylvania via Medicaid." (Id. ¶41).

Plaintiff's assertion that the employers were working "too many hours" and that the numbers of hours worked "violated labor laws," (id. ¶¶40–41), amounts to a "mere conclusory statement" of misuse of funds. *Fowler*, 578

F.3d at 210 (quoting *Ashcroft*, 556 U.S. at 678). It does not present sufficient factual matter for the court to conclude that a substantial misuse of Commonwealth funds is plausible. *See Grim*, 2019 WL 358520, at *4. So these allegations are not sufficient to survive dismissal under Rule 12(b)(6).

Thus, as Plaintiff has not adequately pled that she reported wrongdoing by a public body or waste by an employer, Count II will be dismissed.

### C. Pennsylvania Public Policy

In Pennsylvania, there is a "strong presumption" that "all non-contractual employment relations" are "*at-will*." *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 290 (Pa. 2000). And under Pennsylvania law, an at-will "employee may bring a cause of action for a termination of [his employment] only in the most limited circumstances, where the termination implicates a clear mandate of public policy." *Weaver v. Harpster*, 975 A.2d 555, 563 (Pa. 2009).

"[T]he Supreme Court of Pennsylvania has instructed courts to ascertain whether an employer's conduct implicates public policy by reference to the state constitution, Pennsylvania judicial precedent, and statutes promulgated by the Pennsylvania legislature." *Warner v. United Nat. Foods, Inc.*, 513 F.Supp. 3d 477, 481 (M.D. Pa. 2021) (first citing *McLaughlin*

*v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 288 (Pa. 2000), and then citing *Weaver*, 975 A.2d at 563). Thus, allegations of public policy violations must be grounded in "reference to the laws and legal precedents" of the state rather than "general considerations of supposed public interest." *Shick v. Shirey*, 716 A.2d 1231, 1237 (Pa. 1998).

"Pennsylvania courts have recognized the public policy exception where the employer: (1) compels the employee to engage in criminal activity; (2) prevents the employee from complying with a duty imposed by statute; [and] (3) discharges the employee when a statute expressly prohibits such termination." *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 111–12 (3d Cir. 2003) (citing *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa. Super. Ct. 1998)). Outside of the *Fraser* scenarios, "[c]ourts will determine whether an employee's discharge violates a clearly mandated public policy on a case-by-case basis." *See Herskowitz v. County of Leb.*, Civ. No. 1:13-cv-00431, 2013 WL 5719250 (M.D. Pa. Oct. 1, 2013), at *22. The public policy must "strike[ ] at the heart of a citizen's social right, duties and responsibilities." *Burkholder v. Hutchison*, 589 A.2d 721, 723–24 (1991).

Plaintiff has not alleged that Defendant wrongfully terminated her in violation of public policy. Although Plaintiff makes specific reference to state law, she does not allege any of the three *Fraser* scenarios. And *Fraser*

notwithstanding, she has not alleged a discharge violating clearly mandated public policy.

The Complaint cites Pennsylvania regulations governing the administration of home healthcare organizations, (Doc. 1 ¶¶38-39, 70), and submits that these laws have clear policy interests. (Id. ¶¶77–79). Although Plaintiff has not alleged a violation of the PWL, that the PWL's existence evinces Pennsylvania's "clear and important interest in policy in encouraging the reporting of and preventing wrongdoing/waste within a publicly-funded entity" is inarguable. (Id. ¶79). Similarly, the existence of the cited state regulations governing employee file maintenance and background checks evinces Pennsylvania's "clear and important interest and policy in ensuring that persons working for home care and home health care agencies provide safe, healthy, and quality care to their consumers as well as in ensuring employee charts and files are maintained appropriately" and "in encouraging the reporting of unsafe and improper practices of home and health care agencies." (Id. ¶¶77–78). Thus, Plaintiff has pointed to "a common law, legislative, or constitutional principle from which a clear public policy [mandate] can be inferred." *Warner*, 513 F.Supp. 3d at 482–83.

Plaintiff has not succeeded, however, in alleging any of the *Fraser* scenarios. With regard to (1), Plaintiff argues that what Caregivers did was

"tantamount" to compelling her to engage in criminal activity. (Doc. 14 at 18).

An employee's discharge violates public policy "if the discharge result[ed] from the employee's refusal to engage in conduct prohibited by law." *Clark v. Modern Group Ltd.,* 9 F.3d 321, 331 (3d Cir. 1993). Here, Plaintiff pleads that her termination resulted from the reports that she made to Defendant. (Doc. 1 ¶81). She thus reasons that "to avoid Defendant's retaliation, [she] would have had to lie to state authorities or otherwise make no reports[,] thus abetting Defendant's regulatory violations." (Doc. 14 at 23) The court is not convinced by this argument. Plaintiff identifies neither a statutory duty for her to report noncompliance (and thus does not allege *Fraser* scenario (2)) nor affirmative conduct by Defendant compelling her to lie to state authorities (such that she had to *refuse* to do so).

With regard to (3), Plaintiff does not allege that a statute prohibited her termination. She pleads that her termination violated the PWL's protection of reports of wrongdoing and waste, (Doc. 1 ¶81), but as discussed with respect to Count II, the court concludes that she has not alleged a PWL violation. Outside of the PWL, Plaintiff also cites various state regulations concerning the safety and quality of care given to consumers. (Id. ¶¶38–39). These regulations do not govern employee protections from termination. Thus,

Plaintiff has not alleged that her termination implicated any of the three *Fraser* scenarios.

Plaintiff argues that the *Fraser* scenarios need not be present, as "Pennsylvania courts have also allowed wrongful discharge claims where employees were fired for seeking workers' compensation benefits, ... for filing unemployment claims, for refusing to take a polygraph test, for refusing to participate in a lobbying effort, and after being pardoned for a crime." (Doc. 14 at 21). *See Weaver*, 975 A.2d at 563–64 (colleting cases). These types of "public policy exceptions to at-will employment" involve "infringements on statutory and constitutional rights." *Id.* at 563. But a firing in retaliation for an employee's report of regulatory non-compliance involves no such infringement. *See Warner*, 513 F. Supp. at 487.

Rather, "Pennsylvania state and federal courts have consistently dismissed [public policy] wrongful termination claims premised on retaliation theories where the plaintiff had no duty to make the report he or she was allegedly fired for submitting." *Id.* at 485–86 (collecting cases). Thus, where a "[p]laintiff [is] under no statutory duty to report [a] [d]efendant's conduct," a theory of retaliatory termination "cannot sustain [a] wrongful termination claim" and "the narrow public policy exception to Pennsylvania's at-will employment doctrine cannot apply. *Id.* at 487. (citing *Hunger v. Grand Cent.*

- 28 -

*Sanitation*, 670 A.2d 173, 176 (Pa. Super. Ct. 1996) ("If an employee is fired for performing a function that he is *required* to perform by law, an action for wrongful discharge on public policy grounds will be allowed.")).

Again, Plaintiff identifies no statutory duty to make the reports that allegedly resulted in her termination, so that termination cannot form the basis for a wrongful termination in violation of public policy claim. Count III will therefore be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss will be denied as to Count I with respect to retaliation. As to Count I with respect to discrimination, Count II, and Count III, the motion will be granted. An appropriate order will follow.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: August 9, 2024**
24-75-01

- 29 -